**STATE ex rel. GLENN et al. v. JORDAN.**
No. 3416.

Court of Civil Appeals of Texas.   Amarillo.
April 30, 1930.

Rehearing Denied May 28, 1930.

T. T. Bouldin, of Mineral Wells, and G. E. Hamilton and J. Farris Fish, both of Matador, for appellants.

Williams & Day, of Plainview, for appellee.

HALL, C. J.

The state of Texas on the relation of C. L. Glenn and others instituted this proceeding to remove Judge J. Floyd Jordan, respondent, from the office of county judge of Motley county. Relators' petition was filed September 17, 1929. District judge, in vacation, on the same day, entered an order on the minutes of the court, which recites that on September 17th came on to be heard in vacation the motion of the relators for citation to be issued and served, together with a certified copy of relators' petition, upon the defendant. In that order, the court directed the issuance of citation for the county judge and the service thereof, together with a certified copy of the petition. Process was made returnable on Tuesday, the 12th day of November, 1929, at a regular term of the district court.

On September 19th, the relators filed their motion, reciting that they had on the 17th day of September, 1929, filed their petition seeking the removal of respondent from office and in said motion prayed for the issuance and service of citation, together with a certified copy of the petition previously filed. On November 15, 1929, the relators filed their first amended original petition. The district attorney of that district signed both the original and amended petitions. The grounds for removal, as set up in the relators' first amended original petition, are, in substance, as follows:

(1) That the respondent was elected to the office of county judge of Motley county at the general election in 1926, and thereafter on the 1st day of January, 1927, qualified and entered upon the duties of his office; that at the general election in 1928 he was re-elected to said office, was duly notified of his election and assumed the duties of the office, but failed to qualify by making bond or taking the oath of office; that he has since said time wrongfully and illegally acted as county judge, claiming and collecting the fees and emoluments of said office without complying with the requirements of the law as to giving bond and taking the oath of office.

(2) That on or about September 2, 1929, and a few days before the filing of this suit, the respondent tendered his resignation as county judge to the commissioners' court of Motley county; that his resignation was accepted by the court and entered of record, and he was immediately reappointed county judge by the county commissioners; that he then made an official bond and took the oath of office as county judge.

(3) That the respondent, acting as a member of the commissioners' court, and under his direction and with his approval, a contract was entered into with the Southwestern Auditing Company on the 11th day of March, 1928, binding Motley county to pay to said company the sum of $20 per day to have the books of the county audited; that said contract was illegal because no resolution had been passed by the commissioners' court as required by law, reciting the reasons and necessity for such audit, and no such order or resolution was ever published in any newspaper as required by law; that under the direction and with the approval of respondent, the sum of $127.50 was illegally paid December 11, 1928, to said audit company, and a further payment of $44.50 was illegally made to said company on the 9th day of April, 1929.

(4) That the respondent, acting as a member of the commissioners' court, wrongfully and illegally contracted with one John Palmer to institute suit in behalf of Motley county to recover certain sums of money alleged to be owing said county, and in pursuance of said contract, unlawfully paid Palmer the sum of $1,000 in cash out of the county treasury.

(5) That the respondent, acting in his official capacity, caused to be unlawfully expended certain sums of money out of the county's funds to repair a public road outside of Motley county.

(6) That respondent, as a member of the commissioners' court, wrongfully, willfully, and illegally passed an order attempting to fix the salary of the county treasurer of Motley county at $1,200 per annum instead of paying her the commissions allowed by law.

(7) That respondent, with full knowledge and intent, illegally approved the accounts of the four commissioners of Motley county, whereby they were paid the sum of $75 per month each, regardless of the work actually done, and in violation of the statute, which provides that they shall receive only $5 per day each for the days actually worked.

The court sustained the respondent's exceptions to the paragraphs in relators' amended pleading relating to the contracts with the Southwestern Auditing Company and John Palmer.

The respondent answered, alleging among other things that he was not learned in the law and that when he and the commissioners assumed the duties of their offices for the second term, they inquired of the county attorney of Motley county as to the necessity of filing new bonds, and were told by him that their old bonds were sufficient and new ones were not necessary.

Respondent further alleged that the payments out of the county treasury for road repairs outside of Motley county were made in compliance with a contract Motley county had with Childress and Cottle counties, and that Motley county would be reimbursed. It is further alleged that the order granting the county treasurer a salary was improperly entered and that such was not the intention of the commissioners' court.

After hearing the evidence, the court instructed a verdict for the respondent, and judgment was entered in his favor.

■ By the first three propositions, the appellants contend that where a county judge and three county commissioners are elected to a second term to succeed themselves and assume the duties of their offices for such second terms but fail, for a period of nine months, to take the oath of office or file official bonds, they are de facto officers only, and subject to removal; that where one is appointed to the office of county judge by a commissioners' court, three members of which are de facto officers only, such appointment makes the appointee no more than a de facto officer, and that such appointment does not have the legal effect of creating such judge a de jure officer.

The Constitution of Texas, art. 16, § 17, provides that all officers shall continue to perform the duties of their respective offices until their successors shall be duly qualified, and by Revised Statutes, art. 18, the Legislature, pursuant to that constitutional provision, said that each officer either elected or appointed under the laws of this state, and each commissioner or member of any board or commission created by the laws of this state, shall hold his office for the term provided by law and until his successor is elected or appointed and has qualified. These provisions are held to be mandatory and have the effect of continuing the officer as such in office with all the powers incident thereto until his successor has duly qualified, to the end that there should be no vacancy in any office and the functions of government should not cease. El Paso & Southwestern Railway Co. v. Ankenbauer (Tex. Civ. App.) 175 S. W. 1090; Keen v. Featherston, 29 Tex. Civ. App. 563, 69 S. W. 983; McGhee v. Dickey, 4 Tex. Civ. App. 104, 23 S. W. 404; Jones v. City of Jefferson, 66 Tex. 576, 1 S. W. 903.

In Cowan v. Capps, 278 S. W. 283, this court held that under such circumstances the officer holding over was a de jure rather than a de facto officer. 46 C. J. p. 969, § 111, page 971, § 115.

In 22 R. C. L. 598, § 320, it is said: "Care is required to distinguish between one who holds over without any legal right to do so, thereby becoming a de facto officer, and one who has the legal right after the expiration of his term to continue in office until his successor has qualified. In such case, the officer holding over is one de jure and not de facto."

In sections 257 and 258 of the same authority, it is said: "Not infrequently it is provided in the Constitution of a state that public officers shall continue in office after the expiration of their official terms until their successors are duly qualified. Such a provision may be made applicable to elective as well as appointive officers. For example, a governor whose term extends until his successor is duly qualified continues in office until the declaration of his successor's election has been made in the manner provided by the Constitution. An officer is not prevented from continuing to discharge the duties of his office after his term, where no successor has been chosen, even by a provision of the Constitution limiting the term of office and making an incumbent ineligible to re-election or declaring that the duration of an office should not exceed a given number of years. * * * Similarly by statute the term of an office may be designated as a given number of years and until the incumbent's successor is elected and qualified."

"Where a constitutional or statutory provision exists permitting or commanding an incumbent of an office to continue in the discharge of his duties until his successor is qualified, the expiration of the official term not only does not create a vacancy but the period between the expiration of his term and the qualification of his successor is as much a part of the incumbent's term of office as the fixed statutory period. This is true even where a person is elected his own successor. * * * The practical effect of a constitu-

tional provision directing that public officials should hold over until their successors are qualified is that a public office does not actually become vacant, in the sense that there is no incumbent to fill it, except in the case of death."

■ We think the weight of authority is to the effect that the appellee, in holding over even without complying with the formal requisites of taking the oath of office anew and filing a new bond as county judge, continued him in office as de jure judge. If we are in error in this holding, however, the record shows that before the institution of this suit, the appellee filed his resignation as county judge on September 2d, that it was duly accepted by the commissioners' court and entered of record as required by law, and that he was immediately appointed by the commissioners' court as county judge and forthwith took the oath of office and filed his official bond. We are of the opinion that the effect of this proceeding was to constitute the respondent de jure county judge of Motley county, notwithstanding the fact that it was shown by the evidence that three members of the commissioners' court, who had previously been re-elected as county commissioners, had failed to qualify as such by taking the oath of office and filing official bonds. If it be admitted that such commissioners were, until they had duly qualified, merely de facto officers, nevertheless, in order that the functions of the county government might not cease, it became their duty, as de facto officers, to fill the vacancy created in the county judge's office by the resignation of the respondent, to elect or appoint a county judge.

The law required the commissioners to hold over until their successors qualified and while doing so to perform the duties of a commissioners' court, one of these being the appointment of a county judge to fill the vacancy created by the resignation of respondent, and since their act in appointing respondent involved the interests of the public, it must be upheld. 22 R. C. L. 601, 324. ·

■ The record shows that the county judge and the three commissioners in question had all been re-elected at the previous general election and if it be admitted that they were all de facto officers, the commissioners are not parties to this suit and their authority cannot be attacked in a collateral way. 22 R. C. L. 653, § 325. Aulanier v. Governor, 1 Tex. 653; McKinney v. O'Conner, 26 Tex. 5; Biencourt v. Parker, 27 Tex. 558; Thulemeyer v. Jones, 37 Tex. 560; Ex parte Mayes, 39 Tex. Cr. R. 36, 44 S. W. 831.

The Constitution, art. 5, § 18, provides that a county commissioner shall hold his office for two years and until his successor shall be elected and qualified.

"The acts of an officer de facto are as valid and effectual where they concern the public or the rights of third persons until his title to the office is judged insufficient, as though he were an officer de jure and the legality of the acts of such an officer cannot be collaterally attacked in a proceeding to which he is not a party." 46 C. J. 1060, § 378; 22 R. C. L. 601, § 324.

■ The appellants contend that because the commissioners were acquainted with the status of the county judge at the time he resigned, the proceeding on September 2d is fraudulent and void, and cites the Missouri case of State v. Perkins, 139 Mo. 106, 40 S. W. 650, and U. S. v. Alexander (D. C.) 46 F. 728, which, to some extent, question the legality of the acts of de facto officers, saying that such acts must pass the ordeal of the closest scrutiny and be ratified only in so far as they may be justified by public policy and necessity. Appellants brand the proceedings on September 2d as a sleight of hand manipulation of affairs by the judge and county commissioners, through which they managed to utilize their de facto powers for their own personal advantage, and ask how a body can be a de facto court one minute and by their own acts through a process of resigning and appointing each other be a full-fledged de jure court the next minute. They assert that "the lustre of the hocus-pocus magician of the medicine shows of the past decade loses its brilliancy and glow when compared with the mysterious powers of these modern, magical manipulators of the law," and insist, "but like the tricks of the old time magician the catch in this official legerdemain may be easily detected upon close scrutiny."

In so far as the record shows, respondent and the commissioners were resorting to perfectly legal methods and exercised diligence, as the Apostle Peter advises, to make their calling and election sure, which is a good rule to be observed either in matters political or spiritual. The prior administration of these same officers had been indorsed at the polls at the previous election by a majority of the voters, and whether that majority consisted of bolters or middle-of-the-roaders does not appear from the record and is an immaterial inquiry, since a party primary election is not called in review.

■ The rule invoked by appellants, "Whether molded by human hands or divine hands that a thing created cannot be greater than its creator," has no application. The officers in question had been indorsed as a commissioners' court at the polls. They had been selected by a majority of the citizens of Motley county, and, in an effort to comply with all the requirements of the law, we cannot presume that they were prompted by fraudulent motives or motives other than to effectually carry out the will of the people in so electing them.

For the reasons stated, we overrule the first three propositions.

██ The record shows that the sums of $127.50 and $44.50 were paid December 11, 1928, and April 9, 1929, to an auditing company which had been employed by the commissioners' court to audit the books of the county. R. S. article 1641, with much particularity, describes the procedure necessary to be pursued in the employment of an auditor by a county and none of these requirements were observed. If the auditors did the work of auditing the books of the county after having been employed to do so, they were not entitled to recover the contract price because of the illegality of the method of their employment but could recover only upon a quantum meruit. Cochran County v. West Audit Company (Tex. Civ. App.) 10 S.W.(2d) 229. The contract itself was made during the first term of the respondent but one of the payments having been made in 1929, and the other after the general election of 1928, such wrongful misapplication of the county's funds was a proper matter to be considered by the jury. Brackenridge v. State, 27 Tex. App. 513, 11 S. W. 630, 4 L. R. A. 360; R. S. article 5986; McKinney v. State, 104 Tex. Cr. R. 315, 283 S. W. 798.

██ The appellants attack the respondent because of his act and acquiescence in proceedings which resulted in a misapplication of the county's funds to the payment of illegal claims and compensation to certain county commissioners, the contention of appellants being that because the assessed valuation of property in Motley county did not exceed $6,500,000, the commissioners were entitled to collect only $5 per day for the days they actually served as commissioners in the performance of their official duties. Revised Statutes, art. 2350, as amended by the Fortieth Legislature, c. 490, § 1, and First Called Session, p. 138, c. 46, § 1 (Vernon's Ann. Civ. St. art. 2350), provides that in counties having an assessed valuation of less than $6,500,000, each county commissioner shall receive $5 per day for each day served as commissioner, and, when acting as ex officio road superintendent in his precinct, not to exceed $1,000 in any year. Said article recites, " 'Assessed valuation' means the total assessed valuation of all properties as shown by the tax rolls certified by the county assessor, approved by the Commissioners' Court and approved by the Comptroller for the previous year."

To the introduction of the tax rolls of Motley county, for the purpose of proving the assessed valuation, the appellee objected because the roll had not been approved by the comptroller, and the court sustained the objection. We think this was error. The rolls came from the proper depository and were shown to have been in the custody of the proper officer. They were sworn to by the tax assessor and certified by the commissioners' court, sitting as a board of equaliza-

tion. That the rolls were incorrect is not contended. It is the duty of the assessor to make out his tax rolls in triplicate, one for the comptroller, one for the tax collector, and the third to be filed with the county clerk. These three sets are all original records. The statutes do not require that the comptroller shall put his certificate upon each set. The presumption is that the tax assessor has performed his official duty in making out the three separate copies, and the approval by the comptroller of one is in legal effect the approval of the other two. The statute does not make the approval of the comptroller a condition precedent to the introduction of either copy in evidence. Under Revised Statutes, article 3720, the copy of the tax rolls offered was clearly admissible. Having been examined, approved, and certified by the respondent in his official capacity, the rolls were admissible against him as an admission against interest. Webb County v. Gonzales, 69 Tex. 455, 6 S. W. 781. As said in 22 C. J. 801–803, "A record or document kept or prepared by a person whose public duty it is to record truly the facts stated therein, when relevant, are admissible as prima facie evidence of such facts. * * * The rule admitting official registers and documents has been applied to * * * tax receipts and records generally, including books of assessors." If the comptroller's certificate of approval was necessary to the validity of the tax assessor's rolls, then they would not form a basis for the collection of delinquent taxes. It was not shown that the comptroller had refused to approve the copy of the rolls filed with him, and, in the absence of a statutory requirement, the rolls delivered by the assessor to the collector need not be certified by the comptroller. The respondent's own signature appeared upon the copy of the tax rolls offered in evidence, and he certifies that they are true and correct.

██ Because of the court's action in excluding the tax rolls, the evidence is meager as it relates to the compensation charged to have been illegally paid to the several commissioners. However, there is enough testimony in the record to have required the court to submit the case to the jury.

██ The statement of facts is not prepared in accordance with the rules. It consists of 100 pages principally of documentary evidence such as copies of official bonds, official oaths, contracts with other counties, copies of orders of the commissioners' court in full, of vouchers, warrants and itemized accounts inserted therein verbatim, in violation of District and County Court Rules 72, 73, 75, and 76. If these rules had been observed, the voluminous statement of facts could have been reduced to not more than twelve or fifteen pages. These numerous documents and writings are indexed as "Relators' Exhibit LLL," and "Relators' Exhibit

926

PEX A," "Relators' Exhibit · OOO," "Relators' Exhibit QQQ," and so on through the entire list. The index does not indicate the nature or the contents of any of these numerous exhibits. It would be better practice for the index to state the nature of each exhibit or else have no index at all.

 What we have said with reference to the contract made with the auditing company is also applicable to the contract made with John Palmer, in so far as any further compensation may have been made to Palmer. It was shown that the respondent, as a member of the commissioners' court, was instrumental in paying about $400 toward the construction of a calaboose for the town of Roaring Springs in Motley county. We do not know the date of this payment, but if it was made since the election of 1928, it· is a proper matter of inquiry. State ex rel. Rawlings v. Loomis (Tex. Civ. App.) 29 S. W. 415; Gordon v. State, 43 Tex. 330; Brackenridge v. State, supra.

On January 1, 1929, the respondent, as a member of the commissioners' court, entered into some sort of a contract with Childress and Cottle counties, binding Motley county to be responsible for part of the expense of building a bridge across Pease river at a point not in Motley county, and the record further shows the payment of certain amounts of the county's funds toward the performance of that contract. We know of no law authorizing the commissioners' court of one county to build or contribute to the building of bridges in another county.

The record further shows that on March 10, 1929, the commissioners' court entered an order fixing the county treasurer's salary at $1,200 per year, and some of the numerous exhibits disclose that payments were made under that order. It is probable that these payments constitute a misapplication of county funds, but, on account of the record, we are unable to determine these matters accurately.

The record shows further a great many warrants and checks issued to the three county commissioners for services attending the court at $5 per day, and for approximately $70 per month during 1929, for "fourteen days supervising roads." The record does not show how many roads there are in Motley county but unless that county has a great many more than the average western county, these facts would indicate that its roads were exceedingly well supervised. Full inquiry of these matters, it appears, was prevented by the ruling of the court excluding the tax rolls.

Revised Statutes, art. 5972, provides that by incompetency is meant gross ignorance of official duties or gross carelessness in the discharge of them, and article 5973 provides

that official misconduct, as used with reference to county officials, means any unlawful behavior in relation to the duties of his office, willful in its character, and includes any willful or corrupt failure, refusal, or neglect of an officer to perform any duty enjoined on him by law.

Several pages of the statement of facts are. made up of numerous amounts, principally less than $100 each, which the commissioners' court approved and ordered paid and which appellants insist were unauthorized, and the payment thereof illegal. There are gasoline bills due filling stations, repair bills upon automobiles, blacksmith bills, etc., without any showing ·as to whose automobile was repaired and for whom the gasoline was purchased. The relators had a right to go fully into these matters, and, even in the imperfect and unsatisfactory condition of the evidence appearing in the statement of facts, we think the court should have submitted the case to the jury.

For the reasons stated, the judgment is reversed, and the cause remanded.