# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00557-CR

**Edwin Delamora, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 390TH JUDICIAL DISTRICT NO. 9024117, HONORABLE JULIE H. KOCUREK, JUDGE PRESIDING

## O P I N I O N

Appellant Edwin Delamora appeals his capital murder conviction for murdering a peace officer "who is acting in the lawful discharge of an official duty and who the person knows is a peace officer." Tex. Pen. Code Ann. § 19.03(a)(1) (West 2003). The jury found appellant guilty of capital murder as alleged. The State did not seek the death penalty. The automatic penalty was life imprisonment. Tex. Pen. Code Ann. § 12.31(a) (West 2003). The trial court assessed a life sentence.

## Points of Error

Appellant advances four points of error. First, appellant contends that the trial court erred in overruling the motion for new trial based on newly discovered evidence material to

appellant's guilt of capital murder. Second, appellant urges that he was denied the effective assistance of trial counsel who failed to investigate and produce evidence at trial that the deceased, Keith Ruiz, was not a peace officer acting in the discharge of an official duty. Third and fourth, appellant claims that the trial court erred in limiting the cross-examination of Deputy Sheriffs Richard Hale and Billy Poole regarding their relationship with a confidential informant.

**Facts**

Appellant does not challenge the legal or factual sufficiency of the evidence to sustain his capital murder conviction. The background and facts are pertinent to the points of error. We shall review the applicable facts.

The offense grew out of the execution of a narcotics search warrant at appellant's mobile home in a trailer park in the Del Valle area of Travis County on the evening of February 15, 2001. Law enforcement officers of the Capital Area Narcotics Task Force were called upon to execute the search warrant in question. Knowing that trailer home doors open outwards and are hard to breach when necessary, the officers called upon Deputy Sheriff Keith Ruiz, the deceased, and Deputy Sheriff Derek Hill to assist. Both Ruiz and Hill were members of the Travis County Sheriff's Swat Team. They had specialized training in breaching doors that opened outwards. Ruiz had been a deputy sheriff for thirteen years and a member of the Swat team for seven years.

At a briefing at 7:30 p.m. on February 15, 2001, Investigator Billy Poole discussed the details of the assignment with the officers involved. At approximately 9:30 p.m. that evening, the officers approached appellant's mobile home wearing black battle dress uniforms with the word

2

"Sheriff" emblazoned on them.[1] All the officers had their weapons drawn except deputies Hill and Ruiz, who carried tools to be used in breaching the trailer door.

The officers took their assigned positions. Deputy Ruiz stationed himself on the stairs leading to the trailer house door. Deputy Hill banged or knocked loudly on the side of the trailer three times, and yelled "Police, search warrant." No noise from inside the trailer was heard. After three to five seconds, Hill took a ram and swung it at the trailer door just below the doorknob. Ruiz began to pry on the door with a "hooligan tool." The officers still heard no sound from within the trailer house. Deputy Craig Smith yelled, "Police, search warrant" several times and Investigator Poole followed up in Spanish with "Policia."

Hill again used the ram on the door, and Ruiz tried a second time to pop the door open with the hooligan tool. At this point, the whole process had consumed from twenty seconds to several minutes. As Ruiz began his third attempt to open the door, a window of the trailer house shattered. Some officers saw a hand sticking through the broken window, holding a pistol which was pointed downwards. Some officers saw a flash of bright light and heard the sound of a gunshot. Ruiz fell off the steps to the trailer. Detective Cyril Friday and other officers yelled, "shots fired." Deputy Craig Smith returned fire toward the trailer to cover the team.

Ruiz was dragged to safety and some officers began to administer aid. Other officers yelled to the occupants of the trailer house to come out. Appellant Delamora emerged wearing only white boxer shorts. His right hand was bleeding from a gunshot wound. Appellant's wife and two children followed appellant out of the house.

---

[1] The exception was Deputy Sheriff Teague who left his insignia on another vest.

3

A search of the trailer house revealed a storage box under the sink in a bedroom containing a small scale and methamphetamine [speed] and marihuana divided up into numerous small plastic bags.

An emergency medical team arrived and began to treat both Ruiz and appellant. Lieutenant Paul Barrientos of the Setco Volunteer Fire Department served with the emergency medical treatment team. Upon his arrival at the scene, Barrientos was assigned to treat appellant's wound. After Barrientos treated and wrapped appellant's hand with gauze, he testified that appellant:

> Just kept just hollering and saying that he had—he knew what he had done. He had just shot a cop and that he hoped—why was everyone attending to that cop and why nobody was attending him, doing any type of medical treatment because he was hurting, his hand was hurting, his hand was hurting and why everybody attending to the cop. And then said, that well, I hope that the son-of-a-bitch motherfucker dies because I'm glad he was there.

The record then reflects:

> Q. Did he [appellant] ever make any statement to you with regard to whether or not he knew when he shot that those individuals outside were police officers?
>
> A. Yes, ma'am, he said that they were cops.

Barrientos also testified that appellant began shouting in English to a woman, apparently appellant's wife, for her not to worry, to call Dad, and "Dad will take care of it." Barrientos did not believe that appellant had any difficulty understanding the English language.

4

It appears that Kristi Delamora, appellant's wife, made a 911 telephone call after the shots were fired. The 911 tape and an enhanced version was introduced into evidence. Investigator Poole testified as to what he heard on the 911 tape. The first thing heard on the tape was Mrs. Delamora saying, "No, Edwin!" Apparently concerned for the safety of her family, Mrs. Delamora never told the operators that there was a burglary or robbery in process or that she was being attacked and wanted the assistance of the police. On the tape, Poole heard his own voice yelling in Spanish "Abre la puerta" ("Open the door"). He heard other officers yelling in English. At one point in the recording, a male voice stated: "Let me get my heater" (slang meaning gun). After Mrs. Delamora left the trailer, Poole attempted to speak in Spanish, but she requested that he speak in English as she did not fully understand Spanish.

Andrew Hartman, a Travis County jail inmate, was in the jail with appellant in late September 2001. Appellant told Hartman that he knew before he fired the gun that the people outside the trailer were police officers. Appellant also told Hartman that he heard sounds outside the trailer, saw the police, and tried to get rid of the dope he had—which was approximately a pound of methamphetamine. Hartman did not learn whether appellant had been able to dispose of the "dope." Appellant first told Hartman that he fired his weapon out of the door, but sometime later stated that he had fired out of a window at the officers, shooting downwards.

Ruiz was shot in the left upper arm with a nine millimeter Smith and Weston pistol. The bullet entered Ruiz's uniform only one and a half centimeters from the patch that read "Sheriff, Travis County" and "SWAT." The bullet traveled sharply downward through Ruiz's chest, hit both

5

lungs, pierced his aorta, and lodged in his twelfth vertebra. The medical examiner ruled that the gunshot wound of the chest causing the large rupture of the aorta was the cause of death.

As appellant's brief points out, appellant at trial sought to show that the law enforcement officers failed to follow proper procedure in conducting "a dynamic entry" into appellant's home; and that the post-shooting investigation "was done poorly." The defense also advanced the theory that Ruiz had been shot by friendly fire and not by appellant; that the friendly fire resulted when a "raid" team member returned fire.[2] Appellant also challenged two "raid" team members' credibility by showing a personal relationship between them and a confidential informant, who had two brothers employed by the Travis County Sheriff.

At the conclusion of the evidence at the guilt/innocence stage of the trial, the trial court submitted the issue of capital murder to the jury as alleged in count one of the indictment, as well as the offenses of aggravated assault upon a public servant as alleged in count two of the indictment, and the offenses of murder as alleged in three paragraphs of count three of the indictment. Various issues of self-defense and defense of a third person were also submitted. The jury found appellant guilty of count I beyond a reasonable doubt and rejected all defenses.

---

[2] Calvin Story, a ballistic expert, testified that ballistic tests showed that the lead core (insides of a projectile) recovered from Ruiz's body at the time of the autopsy was consistent with having been fired from a nine-millimeter Smith and Weston pistol, but he was unable to say it was fired from appellant's nine-millimeter Smith and Weston pistol. A bullet found on the steps of the house was also consistent with having been fired with the same type of weapon. Story was positive that the lead core in Ruiz's body had not been fired from a Colt AR 15 weapon such as used by Deputy Craig Smith in returning fire. Smith was the only peace officer to fire his weapon.

## Motion for New Trial

The first complaint that appellant urges is that the trial court erred in denying his motion for new trial. After sentencing, appellant's newly appointed counsel on appeal filed a motion for new trial based solely on newly discovered evidence. *See* Tex. Code Crim. Proc. Ann. art. 40.001 (West Supp. 2004). The motion alleged, *inter alia*, that trial counsel discovered only after sentencing that Ruiz was not acting in the lawful discharge of an official duty on the night of his death as required by section 19.03(a)(1) of the Penal Code because he had not complied with article XVI, section 1 of the Texas Constitution and Texas Local Government Code section 85.003 by failing to take an oath of office and an anti-bribery oath and file the same with the Secretary of State and the Travis County Clerk. Tex. Const. art. XVI, § 1; Tex. Loc. Govt Ann. § 85.003 (West 1999).

## The Hearing

At the hearing on the motion for new trial, the only witness was Leonard Martinez, appellant's trial counsel, whose affidavit was attached to the motion. Martinez testified that he had practiced law in Texas for twenty-one years, and had handled thousands of felony cases, including a hundred or more homicide cases, and at least fifteen capital murder cases. There had been jury trials in numerous homicide cases and in two capital murder cases. Martinez confessed that he had never heard of the requirements of taking and filing of an oath by a public official as required by article XVI, section 1 of the state constitution. He never had an opportunity to look at the provisions of section 85.003 of the Local Government Code regarding oaths. Being unaware of these provisions, during preparation for trial, Martinez stated: "I just took it for granted that if he (Ruiz)

7

was employed as a sheriff's deputy by the sheriff, that was kosher, that he was licensed as a peace officer."

Martinez related that he filed several formal "Brady" motions,[3] issued subpoenas, and made open-records requests of the Sheriff's office for complaints against and disciplinary records of officers on the team that executed the search warrant. Counsel acknowledged that the State had a "pretty open" file on the instant case and he was given "Brady" material. Martinez claimed that he was not given any information on Ruiz's failure to take or file an oath of office prior to the incident in which Ruiz lost his life.

Martinez stated that he subpoenaed personnel records but the county attorney filed a motion to quash, and that he was told personnel information on team members had been provided to the trial judge for an in-camera inspection. He added "and since nothing was discovered, I just assumed there was nothing in them."[4]

The County Attorney also provided access to the employment records of all the officers of the team. Martinez related that this offer was made during trial and he was to examine the records between 8 a.m. and 5 p.m., and because of the trial he was unable to comply with the time limitations. The hearing does not reveal that Martinez asked the County Attorney to extend the time period nor was the trial court requested to grant relief in some form. Further, Martinez did not

---

[3] *See Brady v. Maryland*, 373 U.S. 83 (1963).

[4] At the hearing on the motion for new trial, the trial court stated that it had examined in camera the documents furnished; that at Martinez's request it particularly examined the records for two other incidents in which the Sheriff's department had executed a search warrant. The trial court did not recall seeing any documents "regarding the deputizing of Deputy Ruiz." The in camera documents in the appellate record support the trial court's memory.

8

explain why appellant's two additional counsel or his investigator could not have examined the records involved.

Martinez complained at the hearing that the Texas Attorney General did not rule on his open-records requests until after the trial. The requests involving employment history material listed certain individuals but omitted Ruiz's name. Moreover, the requests did not specifically mention Ruiz's employment record or records having to do with oath-taking by any individual or officers. There was no showing that Martinez or any other member of appellant's defense team ever checked in the county clerk's office for the list of appointed deputy sheriffs required to be posted there in a conspicuous place. *See* Tex. Local Gov't Code Ann. § 85.003(b) (West 1999). This may be due in some measure to the fact that Martinez testified that he was unaware of the constitutional and statutory provisions as to oathtaking until he was "tipped" four days after sentencing that Ruiz may not have filed any oath, if taken.

Martinez also testified that if he had been timely given the information, he would have tried to get the capital murder offense reduced to murder although that "would have been extremely difficult." He stated that he would have filed certain pretrial motions, sought a jury charge on the lesser-included offense, and raised the issue that Ruiz was not acting, at the time of his death, in the lawful discharge of an official duty. Martinez insisted that it was not a part of his trial strategy to fail to bring forward noncompliance with the named constitutional and statutory provisions. Martinez felt that the outcome of the trial would have been different if the information had been made available to him.

After Martinez's testimony, appellant's counsel asked the trial court to take judicial notice of all the court's records in the instant case. Counsel then offered, without objection, defendant's exhibit number one (for the hearing on the new trial motion) showing a certificate from the Texas Secretary of State that a search of the records revealed a filing for Keith Ruiz as Deputy Sheriff of Travis County dated January 2, 1997. Defendant's exhibit number two certified that the attached document was a true and correct copy of the appointment of Keith Ruiz as a deputy sheriff dated January 2, 1997, on file with the Secretary of State. Appellant's appellate counsel also offered defendant's exhibit number four, a certified copy from the county clerk's office of the deputation of Keith Ruiz dated January 9, 1997, and an oath of office dated January 2, 1997. There was no objection to these exhibits. Defense exhibit number thirteen, an affidavit from a deputy county clerk dated September 20, 2002, was admitted over objection. The affidavit listed names of nine individuals including Ruiz's. It then simply stated: "The records presented are all the Deputations and Oaths found on the above persons." There was nothing attached to show the "records presented." The court reporter's notes then reflect:

MS. ICENHAUER-RAMIREZ
(defense counsel on appeal): Judge, we also have asked the court, are asking the court to take judicial notice of the fact that Sheriff Margo Frasier was initially elected in general election in November 5th, 1996. I have records from the Travis County website election returns if the court would like to view these and that she took her initial oath on January 1, 1997.

THE COURT: Any objection from the state?

MS. CASNER: No, Your Honor.

10

| | |
|---|---|
| THE COURT: | Court will take judicial notice of the fact that Sheriff Frasier was elected November 7th—I'm sorry. |
| MS. ICENHAUER-RAMIREZ: | The first one, Judge, she was initially elected into office November 5, 1996 and was sworn into office January 1, 1997. |
| THE COURT: | The court will take judicial notice that Sheriff Margo Frasier was first elected on November 5th of 1996 and her second election that she was elected is November 7th of 2000 and that she assumed her duties on January 1st of 1997.  I assume that she was sworn in as the sheriff of Travis County. |
| MS. ICENHAUER-RAMIREZ: | Right. |
| THE COURT: | Okay.  Anything else? |
| MS. ICENHAUER-RAMIREZ: | That's all the evidence we have, Judge. |

The State offered no evidence.  After hearing argument, the trial court denied the motion for new trial.

**Newly Discovered Evidence**

In his first point of error, appellant claims that the trial court erred in overruling the motion for new trial when appellant showed the existence of newly discovered evidence material to the question of appellant's guilt of capital murder.

Article 40.001 provides that:

A new trial shall be granted an accused where material evidence favorable to the accused has been discovered since trial.

11

Tex. Code Crim. Proc. Ann. art. 40.001 (West Supp. 2004).

There is a four-part test under this statute. A defendant is entitled to have his motion for new trial granted if (1) the newly discovered evidence was unknown to him at the time of the trial; (2) his failure to discover the new evidence was not due to the lack of due diligence; (3) the new evidence is admissible and not merely cumulative, corroborative, collateral, or impeaching; and (4) the new evidence is probably true and will probably bring about a different result. *See Wallace v. State*, 106 S.W.3d 103, 108 (Tex. Crim. App. 2003); *Keeter v. State*, 74 S.W.3d 31, 36-37 (Tex. Crim. App. 2002).[5] A failure by a defendant to establish any of the essential requirements for a new trial based on newly discovered evidence warrants the trial court's denial of the motion. *Shafter v. State*, 82 S.W.3d 553, 556 (Tex. App.—San Antonio 2002, pet. ref'd).

---

[5] For a history of the forerunners of article 40.001 of the Texas Code of Criminal Procedure, former Texas Rule of Appellate Procedure 30(b)(6) (West 1992) and former code article 40.03, and the four-part test, *see* 43A George E. Dix & Robert O. Dawson, *Texas Practice: Criminal Practice and Procedure* § 41.41 (2d ed. 2001); *Keeter v. State*, 74 S.W.3d 31, 36-37 (Tex. Crim. App. 2002). The earlier test also set forth four requirements before a defendant was entitled to a new trial based on newly discovered evidence: (1) the evidence must have been unknown to the movant before trial; (2) the defendant's failure to discover it was not due to a want of diligence on his part; (3) its materiality was such as would probably bring about a different result in another trial; and (4) it was competent, not merely cumulative, corroborative, collateral, or impeaching. *See Drew v. State*, 743 S.W.2d 207, 226 (Tex. Crim. App. 1987); *Boyett v. State*, 692 S.W.2d 512, 516 (Tex. Crim. App. 1985); *see also Moore v. State*, 882 S.W.2d 844, 849 (Tex. Crim. App. 1994); *Jones v. State*, 711 S.W.2d 35, 36-37 (Tex. Crim. App. 1986); *Bolden v. State*, 634 S.W.2d 710, 711-12 (Tex. Crim. App. 1982).

> With the passage of article 40.001, the Legislature clarified our rule by explicitly stating a materiality requirement. The only difference between the new statute and our former rule appears to be that the [new] statute expressly requires the discovered evidence to be "material" while the word "material" was omitted from the rule.

*Keeter*, 74 S.W.3d at 36.

**Evidence Unknown to Movant Before Trial**

The first requirement of the four-part test is that the movant for a new trial based on newly discovered evidence must show that he was unaware of that evidence before the trial concluded. Appellant's trial attorney testified that he was "tipped" four days after sentencing to the fact that Ruiz had not taken his official oaths, or, at least, had not filed the same. The problem that presents itself is that appellant was represented at trial by three attorneys. While the evidence at the hearing on the new trial motion shows that attorney Martinez may have been unaware of the "newly discovered evidence," there was no showing that this matter was unknown to other defense counsel or appellant.

> The courts regard the defendant and his or her attorneys as a "knowledge unit" so that what is known to one is known to all for purposes of determining whether the evidence was known before trial. Thus, if the defendant knew of the existence and identity of a witness but failed to tell his or her attorney of that fact, it is not newly discovered evidence that the attorney learns of this information only after trial. Similarly, if the evidence was known to one of two defense attorneys, that is sufficient to present it from being newly discovered as to the other attorney who learns of it after trial.

43A George E. Dix & Robert O. Dawson, *Texas Practice: Criminal Practice and Procedure* § 41.42 (2d ed. 2001) (citing *Sawyer v. State*, 778 S.W.2d 541, 545 (Tex. App.—Corpus Christi 1989, pet. ref'd); *Zamora v. State*, 647 S.W.2d 90, 94-95 (Tex. App.—San Antonio 1983, no pet.)). Thus, appellant failed to meet the fundamental requirement that the claimed newly discovered evidence was unknown to him and his attorneys at the time the trial concluded.

13

**Due Diligence**

It is not enough that the evidence be unknown to the defense. It must also be alleged and proved that failure to timely discover the evidence was not due to the lack of diligence by the defense. *Boyett v. State*, 692 S.W.2d at 517. "The ultimate question is whether the evidence would have been discovered in time to have been presented at trial by reasonable pretrial investigative efforts." Dix, § 41.43. "If the claim is that evidence was unknown because the defense attorney failed to use diligence to discover it before trial, that is a matter for an ineffective assistance of counsel claim rather than a motion for new trial based on newly discovered evidence." *Id.*

Attorney Martinez took advantage of the State's open file policy, filed pretrial motions including *Brady* motions, and made other efforts to discover and obtain personnel and disciplinary records of the officers involved in the execution of the search warrant. The focus, however, was never on obtaining evidence of Ruiz's oath taking. Martinez acknowledged that he was unaware of the law regarding official oaths. As the State points out, the law requires the county clerk to post a list of appointed deputy sheriffs in a conspicuous place in the clerk's office. *See* Tex. Local Gov't Code Ann. § 83.003(b) (West 1999). The State observes that Martinez did not check any of the public records of the clerk's office regarding oaths prior to the conclusion of the trial. No evidence was offered as to diligence on the part of the other defense counsel or defense investigator. Appellant did not sustain his burden as to the requirement of due diligence.

**Admissible and Not Merely Cumulative**

The "new" evidence here appears to be admissible, and not merely corroborative, collateral, or impeaching, and meets the third requirement of the four-part test. The issue was not

14

contested on this basis at the hearing on the motion for new trial. Neither party has briefed the matter.

## Materiality

The fourth requirement of the test is the materiality prong. The "new" evidence must be shown to be probably true and, as such, will probably bring about a different result. The point appellant sought to make was that Ruiz, at the time of his death on February 15, 2001, had not taken or filed his constitutional oaths after Sheriff Margo Frasier had been elected, taken her oath, and otherwise qualified for a second term as sheriff. As noted, appellant attempted proof only by virtue of affidavits and the taking of judicial notice. Upon appellant's request, the trial court took judicial notice as set out earlier.

There is nothing in the judicial notice requested or in the trial court's statement as to when Sheriff Frasier took her oath of office and otherwise qualified for her second term. Assumption is incompatible with the taking of judicial notice by the trial court. *See* Tex. R. Evid. 201(b).

The office of county sheriff in Texas is established by the state constitution. Tex. Const. art. V, § 23. "All officers within this State shall continue to perform the duties of their office until their successors shall be duly qualified." Tex. Const. art. XVI, § 17. This constitutional provision is self-executing. *Berleu v. State*, 225 S.W.2d 518, 519-20 (Tex. Crim. App. 1920); *Hamilton v. State*, 51 S.W. 217, 219 (Tex. Crim. App. 1898), and it is mandatory. *State ex rel Glenn v. Jordan*, 28 S.W.2d 921, 923 (Tex. Civ. App.—Amarillo 1930, writ dism'd w.o.j.).

15

An officer who holds over after the expiration of his or her term and until such officer's successor has qualified as required by the state constitution is a de jure not a de facto officer, and this is true of an officer who is elected to succeed himself or herself and fails to qualify for the second term. *Hamilton*, 51 S.W. at 219; *Jordan*, 28 S.W.2d at 923; *see generally* 60 T. Jur.3d, *Public Officers And Employees*, § 252 (1988). Such hold-over de jure officer has all the authority to act in that capacity and receive compensation. *Jordan*, 28 S.W.2d at 923; 35 David B. Brooks, *Texas Practice: County and Special District Law* § 7-7 (2002).

Based on the judicial notice taken, Sheriff Margo Frasier of Travis County was eligible on January 1, 2001, to take official oaths of office, post bond, and otherwise qualify for a second term as sheriff. This record is silent as to whether on February 15, 2001, Sheriff Frasier had qualified for her second term or was holding over until her successor (herself) qualified. In the latter situation, Ruiz, who duly qualified as de jure deputy sheriff during the sheriff's first term as reflected by appellant's evidence, would have remained as a de jure deputy while Sheriff Frasier "held over." A deputy sheriff serves at the will of the sheriff. *See* Tex. Local Gov't Code Ann. § 85.003(c) (West 1999).[6] There was no evidence that Ruiz's employment as a deputy had ever been terminated by the sheriff. In fact, the contrary appears. In the former situation, Sheriff Frasier would have qualified for her second term after January 1 and before February 15, 2001. In this situation, in order to

---

[6] There are cases holding a deputy sheriff's term expires when the sheriff's term expires. *See Tarrant County v. Van Sickle*, 98 S.W.3d 358, 364 (Tex. App.—Fort Worth 2003, pet. denied) (citations omitted). These cases were decided under article III, section 52e of the Texas Constitution and its particular language as to "term of office." *Id*. It has been held that art. III, section 52e does not implicitly overrule local government code section 85.003(c)'s "at will" employment of sheriff's deputies. *Id*. at n.6. The constitutional and statutory provisions can be interpreted consistently. *Id*.

16

support his allegations, appellant needed to demonstrate that Ruiz was not a de jure officer on the night of the shooting, by showing both that appellant had failed to take his constitutional oaths and to file the same. No direct evidence was developed to show that in fact Ruiz failed to take his oaths. In attempting to prove that Ruiz failed to file his oath after January 1, 2001, appellant offered documentary evidence from both the Secretary of Texas and the Travis County Clerk that Ruiz had duly filed his oath of office in January 1997, with both agencies. Appellant then offered a certification from the Secretary of State that she made a diligent search of records filed pursuant to "article XVI, section 1 of the Texas Constitution" and found the 1997 filing by Ruiz. This document may leave an inference but there was no conclusive language that no later filings existed. Appellant did offer the affidavit of a deputy county clerk to the effect that she had made a search of deputations and oath records for nine named individuals including Ruiz. The affidavit concluded: "The records presented are all the Deputations and Oaths found on the above persons." It is unclear as to which records the affidavit has referenced. None were attached to the affidavit introduced into evidence.

Even if appellant's "new" evidence had a tendency to support his allegations and the probable truth thereof, there must be a showing that the "new" evidence would probably bring about a different result at another trial. This confronts us with the doctrine of a de facto officer.

**De Facto Officer**

The judicial creation of the de factor officer doctrine serves the purpose of legitimizing the acts of public officials who, for one reason or another, have not technically qualified in all respects. This would include the failure to execute the official oath or bond. The courts have deemed it to be in the public interest not to invalidate on a technicality the acts of persons purporting

17

to be public officials. 35 David B. Brooks, *Texas Practice: County and Special District Law*, § 7:7 (2d ed. 2002).

In *Williams v. State*, 588 S.W.2d 593 (Tex. Crim. App. 1979), the court quoted from *Weatherford v. State*, 21 S.W. 251, 251 (Tex. Crim. App. 1893), in defining a "de facto" officer:

> A de facto officer is one who has the reputation of being the officer, and yet is not a good officer in point of law; in other words, the de facto officer is one who acts under the color of a known and valid appointment, but has failed to conform to some precedent requirement as to take an oath, give a bond, or the like.

*Williams*, 588 S.W.2d at 595; *see also Germany v. Pope*, 222 S.W.2d 172, 176 (Tex. Civ. App.—Fort Worth 1949, writ ref'd n.r.e.).

A de facto officer is:

1. An officer who exercises the duties of an officer under the color of appointment or election, but who has failed to qualify for any one of various reasons, as by being under the required age, having failed to take the oath, having not furnished required bond, or having taken office under a statute later declared unconstitutional.

*Black's Law Dictionary* 7th ed. (West 1999).

In the instant case, there was testimony that Ruiz was a peace officer, that he had been a deputy sheriff of Travis County consistently for thirteen years and a member of the Sheriff's Swat Team for seven years. Evidence of one of his official oaths taken in January 1997 was introduced at the new trial hearing. Ruiz had the reputation of being a peace officer among his fellow peace officers and the public. On February 15, 2001, Ruiz was dressed in a black battle uniform of a peace officer with the word "Sheriff" emblazoned thereon. He had been specially trained in the work of

the Swat Team and on the night in question he was acting with members of that team and officers of the Narcotics Task Force under the circumstances earlier described. Clearly, under the law, Ruiz was a de facto officer at the time of his death, even though no official oath had been taken or filed since January 1, 2001.

In *Freeman v. State*, 556 S.W.2d 287, 303-04 (Tex. Crim. App. 1977), a conviction for the capital murder of a peace officer was upheld even though the record demonstrated that the officer had not filed a notarized oath of office with the county clerk as required by law. The *Freeman* court held that the evidence was sufficient to demonstrate that the victim was a de facto deputy sheriff and hence a peace officer under the capital murder statute. The trial court there did not err in denying a defense motion for instructed verdict. *Id*. at 304.

In *Williams*, 588 S.W.2d at 594-95, the Texas Court of Criminal Appeals affirmed a conviction for aggravated assault on a peace officer, finding that the evidence supported the fact that the officer was a de facto deputy sheriff despite the failure of the officer to take the official oath. Here again, the trial court did not err in denying the motion for instructed verdict on the basis that the complainant was not a peace officer. *Id*. at 595. *Freeman* was cited with approval. *Id*. *See also McGowen v. State*, 885 S.W.2d 285, 287-89 (Tex. App.—Beaumont 1994, no pet.) (affirming convictions for escaping from a peace officer and for aggravated assault on a peace officer when complainant was shown to be a de facto reserve deputy sheriff).

More recently, in *Teevan v. State*, No. 14-02-01051-CR, 2003 Tex. App. LEXIS 6993 at *1 (Tex. App.—Houston [14th Dist.] Aug. 14, 2003, no pet.), the court issued a memorandum opinion because "all dispositive issues are clearly settled in law." In this attempted capital murder

of a peace officer prosecution, the court rejected the defendant's claim that the evidence was legally insufficient based on the failure of the record to show that the complainant was a peace officer because he had not filed his oath of office and bond with the county clerk.  Citing *Freeman Williams*, and *McGowen*, the court held under the circumstances presented the complainant was a de facto deputy sheriff.

In the event of a new trial, appellant would not be entitled to an instructed verdict of "not guilty" as to capital murder as charged in the first count of the indictment.

Without acknowledging *Freeman* or its forerunners or progeny, appellant relies upon *Prieto Bail Bonds v. State*, 994 S.W.2d 316 (Tex. App.—El Paso 1999, pet. ref'd), holding that a retired senior judge, sitting in a district court by assignment of the Presiding Judge of the Administrative Region, was required to take the state constitutional oaths applicable to elected and appointed officials.  994 S.W.2d at 220.  Earlier, the same court held that the judge was a de facto judge despite the absence of an oath and his actions were not void; that the judge's authority could only be questioned through quo warranto action.  *See Prieto Bail Bonds v. State*, 948 S.W.2d 69, 71-72 (Tex. App.—El Paso 1997, pet. granted, judgment vacated and cause remanded), 978 S.W.2d 574, 575 (Tex. Crim. App. 1998).  The remand was in light of *Wilson v. State*, 977 S.W.2d 379 (Tex. Crim. App. 1998) (overruling earlier precedent that a judge's authority could only be challenged by quo warranto proceedings).  On remand, the El Paso court changed its mind and reversed the judgment in the bond forfeiture suit and held that the retired senior judge, sitting by assignment, had to take the constitutional oaths as an appointed officer.  994 S.W.2d at 220.

20

The *Prieto* case leaves many questions. If a retired senior judge opts to retain his judicial capacity as permitted by law[7] and accepts temporary assignments from time to time to different courts, what appointed de jure office does he or she hold? Who is the appointing authority? What is the term of such office? How often must the constitutional oaths be taken by the senior judge? We disagree with the reasoning of the *Prieto* court.

We are, of course, not bound by the decision of another court of appeals. *Lambert v. Affiliated Foods, Inc.*, 20 S.W.3d 1, 8 (Tex. App.—Amarillo 1999), *aff'd sub nom. Lawrence v. C.D.B. Services Inc.*, 44 S.W.3d 544 (Tex. 2001); *Mitchell v. John Wiesner, Inc.*, 923 S.W.2d 262, 264 (Tex. App.—Beaumont 1996, no writ); *Eubanks v. Mullin*, 909 S.W.2d 574, 576 (Tex. App.—Fort Worth 1995 (orig. proceeding); *see also Shook v. State*, 244 S.W.2d 220, 221 (Tex. Crim. App. 1951) (court not bound by a decision of a court of equal jurisdiction). In addition to not being bound by *Prieto*, we find it distinguishable from the instant case on the law and the facts as we do *French v. State*, 572 S.W.2d 934, 939 (Tex. Crim. App. 1978) (op. on 2d reh'g).

Motions for new trial based on newly discovered evidence traditionally lack favor with the courts and are viewed with great caution. *Drew v. State*, 743 S.W.2d 207, 225-26 (Tex. Crim. App. 1987); *Tuffiash v. State*, 948 S.W.2d 873 (Tex. App.—San Antonio 1997, pet. ref'd); *Villarreal v. State*, 79 S.W.3d 806 (Tex. App.—Corpus Christi 2002, pet. ref'd). A review of a denial of a motion for new trial based on newly discovered evidence is based on an abuse of discretion standard. *Lewis v. State*, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995). A reviewing court does not substitute its judgment for that of the trial court, rather it decides whether the trial court's

---

[7] *See generally* Tex. Gov't Code Ann. §§ 74.001 to 74.062 (West 1998 & Supp. 2004).

21

decision was arbitrary or unreasonable. *Drew*, 743 S.W.2d at 225-26. Appellant failed to establish three prongs of the four-part test set forth in *Keeter*, 74 S.W.3d at 36-37. We conclude that the trial court did not abuse its discretion and was neither arbitrary nor unreasonable in overruling appellant's motion for new trial. Appellant's first point of error is overruled.

## Ineffective Assistance of Counsel

In his second point of error, appellant contends that his trial counsel rendered ineffective assistance of counsel "when *he* failed to investigate and produce evidence at trial that Keith Ruiz was not a peace officer acting in the lawful discharge of an official duty." (Emphasis added.) This claim is based on counsel's failure to uncover the fact that Ruiz had not taken his official oaths as deputy sheriff after the sheriff began her second term of office.

## The Standard of Review

The Sixth Amendment to the United States Constitution guarantees the right to the reasonably effective assistance of counsel in a state criminal proceeding. *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970); *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001); *Wilkerson v. State*, 726 S.W.2d 542, 548 (Tex. Crim. App. 1986). In *Strickland v. Washington*, 466 U.S. 668, 689 (1984), the United States Supreme Court held that in order to show ineffective assistance of counsel, a convicted defendant must show that (1) his trial counsel's performance was deficient, in that counsel made such serious errors he was not functioning effectively as counsel; and (2) the deficient performance prejudiced the defense to such a degree that the defendant was deprived of a fair trial. In this connection, a strong presumption exists that counsel rendered adequate

22

assistance and made all significant decisions in the exercise of reasonable professional judgment. "Prejudice" is demonstrated when the convicted defendant shows "a reasonable probability that but for counsel's unprofessional errors, the result of the proceedings would have been different." *Id*. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id*.; *Parmer v. State*, 38 S.W.3d 661, 665 (Tex. App.—Austin 2000, pet. ref'd); *Banks v. State*, 819 S.W.2d 676, 681 (Tex. App.—San Antonio 1991, pet. ref'd). Unless a defendant makes both showings, it cannot be said that the conviction resulted from a breakdown in the adversary process that renders the results unreliable. *Strickland*, 466 U.S. at 687; *Oestrick v. State*, 939 S.W.2d 232, 237 (Tex. App.—Austin 1997, pet. ref'd). Under *Strickland*, a defendant has the burden to prove a claim of ineffective assistance of counsel by a preponderance of the evidence. *McFarland v. State*, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996); *Parmer*, 38 S.W.3d at 665.

The two-pronged standard for testing claims of ineffective assistance of counsel set out in *Strickland* has been adopted for Texas constitutional claims. *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986). Under the *Strickland-Hernandez* standard, any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999); *Josey v. State*, 97 S.W.3d 687, 696 (Tex. App.—Texarkana 2003, no pet.). The assessment of whether a defendant received effective assistance of counsel must be made according to the facts of each case. *Lopez v. State*, 96 S.W.3d 406, 417 (Tex. App.—Austin 2002, pet. ref'd). Whether the *Strickland* test has been met is to be judged by the "totality of the representation" rather than by isolated acts or omissions of trial counsel, and the test is applied at the time of the trial, not through hindsight.

23

*Ex parte Welborn*, 785 S.W.2d 391, 393 (Tex. Crim. App. 1990); *Banks*, 819 S.W.2d at 681. Any judicial review of a defendant's claim of ineffective assistance must be highly deferential to trial counsel. *Thompson*, 9 S.W.3d at 813. There is a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Id.*; *Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994).

We do not speculate about trial counsel's strategy. *Blevins v. State*, 18 S.W.3d 260, 271 (Tex. App.—Austin 2000, no pet.). A reviewing court will not second guess through hindsight the strategy of counsel at trial. In the absence of direct evidence in the record of counsel's reasons for the challenged conduct, an appellate court will assume a strategic motivation if any can be imagined. *Garcia*, 57 S.W.3d at 441; *Skeen v. State*, 96 S.W.3d 567, 580 (Tex. App.—Texarkana 2002, no pet.). *Cf. Moore v. Johnson*, 194 F.3d 586, 604 (5th Cir. 1999). The challenged conduct will not, under the circumstances, constitute deficient performance unless the conduct was so outrageous that no competent attorney would have engaged in it. *Garcia*, 57 S.W.3d at 441; *Thompson*, 9 S.W.3d at 814.

Claims of ineffective assistance of trial counsel can be properly raised on appeal if the appellate record is sufficiently developed. *Robinson v. State*, 16 S.W.3d 808, 813 n.7 (Tex. Crim. App. 2000). In most cases the trial record alone will be insufficient. *See Thompson*, 9 S.W.3d at 813. The record can be developed by a hearing on a motion for new trial based on a claim of ineffective assistance of counsel. *See Reyes v. State*, 849 S.W.2d 812, 815 (Tex. Crim. App. 1993). Appellant failed to do this but relies on the record from the hearing on the motion for a new trial based solely on the claim of newly discovered evidence. Appellant urges that the instant record is

24

sufficient to support his claim. The difficulty is that appellant was represented by three trial attorneys. Whether the *Strickland* test has been met is to be judged by the "totality of the representation." *Welborn*, 785 S.W.2d at 393. As noted earlier, courts regard the defendant and his attorneys as a "knowledge unit." 43A Dix, § 41.42. The point of error is limited to one counsel's failure to investigate and to produce certain evidence. No complaint is directed to the representation by other counsel. We deem the record inadequate to make a fair evaluation of appellant's claim under *Strickland*. Appellant is not foreclosed from presenting his claim via a collateral attack by virtue of an application for post-conviction writ of habeas corpus. *Robinson*, 16 S.W.3d at 812-13; *Jackson v. State*, 973 S.W.2d 954, 957 (Tex. Crim. App. 1998); *Ex parte Torres*, 943 S.W.2d 469, 475 (Tex. Crim. App. 1997).

Moreover, if the evidence appellant claims should have been presented at trial had been admitted, it would not "have negated an essential element of capital murder" as appellant urges. *See Freeman*, 556 S.W.2d at 303-04. The second point of error is overruled.

**Limited Cross-examination**

In this third point of error, appellant complains that the trial court erred in limiting the cross-examination of Deputy Sheriff Richard Hale "regarding his relationship with the confidential informant."

Deputy Sheriff Hale was the first-line supervisor of the Capital Area Narcotics Task Force. Hale was a State's witness and described the events of the night of February 15, 2001, and the shooting of fellow officer, Keith Ruiz, which was the basis of the capital murder offense charged. Hale was fully cross-examined about these matters. Near the end of the cross-examination, Hale was

25

interrogated in general about "dynamic" entries into residences, the goals of such entries, the planning stages, and the risk analyses or assessments made. Hale was asked if he allowed personal feelings or considerations to enter into any decision on assessments and risk analyses. Hale answered, "No."

At this point, appellant asked for a hearing in the absence of the jury to proffer evidence.[8] At the hearing, appellant established the name of the confidential informant,[9] that Hale knew him personally, and that the informant had two brothers who were deputy sheriffs. The trial court moved the hearing "in chambers" because of the nature of the testimony and the safety of certain individuals. At the conclusion of the hearing, the trial court took the matter under advisement. Several days later another "in chambers" hearing occurred with the prosecution taking the initiative in interrogating Hale about the subject matter of his relationship with the confidential informant. At the end of the hearing, no ruling was made by the trial court.

The testimony at the two hearings reflected that Hale knew E.M., the confidential informant, who had two brothers, Mike and Manny, whom Hale knew and with whom he had worked as a peace officer. Some four years before the offense, E.M. had done some sheetrock work at Hale's house, and from time to time had done other work there. Hale indicated that he did not normally socialize with E.M., although he once had attended a barbeque on E.M.'s property.

---

[8] Although appellant did not so state at the time, it was his purpose, in view of Deputy Hale's answer to the last question, to impeach Hale by showing Hale's relationship with the confidential informant.

[9] The State had inadvertently disclosed the name of the confidential informant to appellant. Even after disclosure, the term "confidential informant" was frequently used at trial and carried forward in the appellate briefs. Therefore, we have also used the term in responding to the points of error.

Some three or four months before the offense, Hale received a telephone call from E.M. Hale was surprised because "they did not speak on a regular basis." E.M. complained about thefts at his business and the writing of hot checks. Hale referred him to the Austin Police Department. Because E.M. sounded paranoid, Hale called E.M.'s brother, Mike. Mike knew about E.M.'s complaints and condition. Mike told Hale that he was afraid that E.M. had gotten involved with "speed" which he had obtained from appellant Delamora. The brothers were opposed to the use of E.M. as a confidential informant, but Hale decided otherwise. At one point, Hale revealed that there was an independent narcotics investigation involving appellant.

Hale related that any information received from E.M. was relayed to Deputy Sheriff Billy Poole, who was in charge of the investigation; and that Hale's personal relationship with E.M. or his brothers did not affect his actions. Hale denied that he ever "covered" for E.M. or "tipped" him that he was a suspect in a drug investigation.

The situation came to a head during the presentation of the defense case. Appellant called Hale as a witness without specifying whether he was being recalled for further cross-examination. After the trial court learned that appellant intended to raise the "relationship" issue, a lengthy colloquy ensued. Thereafter, over objections, only the following cross-examination was permitted before the jury.

Q. Officer Hale, were you called by the confidential informant with some concerns?

A. Yes.

Q. Is the confidential informant someone you knew personally?

A. He was an acquaintance.

27

Q. Is the confidential informant a close relative of two employees of the Travis County Sheriff's Office?

A. Yes.

Q. Are those two employees friends of yours?

A. Coworkers, friends, yes.

Q. Friends. Was your decision to undertake the investigation and/or raid personal or professional?

A. Professional.

Q. Was either the informant or the employees present at the time of the raid or in the immediate vicinity at the time of the raid?

A. No, not to my knowledge.

The trial court also found that the balance of the evidence about the "relationship" had "little relevancy" to the issues in a capital murder case. *See* Tex. R. Evid. 401. The prosecution then obtained a ruling that the same evidence's probative value was substantially outweighed by the danger of unfair prejudice. *See* Tex. R. Evid. 403.

## Impeachment on a Collateral Matter

In the cross-examination before the jury, appellant was bound by Hale's answer that no personal feelings or considerations entered into the decision on the risk analysis involved. Appellant was not entitled to impeach Hale by showing Hale's "relationship" with the confidential informant and his brothers. The trial court gave appellant more than that to which he was entitled.

As a general rule, a party is not entitled to impeach a witness on a collateral or immaterial matter. *Ramirez v. State*, 802 S.W.2d 674, 675 (Tex. Crim. App. 1990); *Poole v. State*, 974 S.W.2d 892, 905 (Tex. App.—Austin 1998, pet. ref'd). A party may not cross-examine a witness on a collateral matter, then contradict the witness's answer. *Shipman v. State*, 604 S.W.2d 182, 184-85 (Tex. Crim. App. 1980); *see also Flannary v. State*, 676 S.W.2d 369, 370 (Tex. Crim. App. 1984); *Drone v. State*, 906 S.W.2d 608, 615 (Tex. App.—Austin 1995, pet. ref'd). A collateral matter is one which seeks only to test a witness's general credibility or relates to facts irrelevant to issues at trial. *Keller v. State*, 662 S.W.2d 362, 365 (Tex. Crim. App. 1984). The evidence sought to be introduced by appellant (some of which was admitted) bears no relationship to any contested issue in the capital murder trial.[10] Moreover, appellant argues on appeal the exclusion of the evidence was "extremely damaging to the defense case" because one of the defensive theories was that all the officer-witnesses were "lying" about what occurred on the night of February 15, 2001. Appellant insists that the excluded evidence would have reflected on the credibility of all the testifying officers, particularly Hale, as to the issues of whether proper procedures were followed, whether proper announcements were made, and the question of friendly fire. Appellant contends that he was entitled to test the general credibility of several witnesses by use of such evidence. This

---

[10] There was no evidence establishing the invalidity of the search warrant. Moreover, once the appellant used force against the officers, the legality of the search warrant became immaterial. *See Solis v. State*, 704 S.W.2d 883, 885 (Tex. App.—Corpus Christi 1986, pet. ref'd). A capital murder conviction for killing a police officer under section 19.03(a)(1) of the Penal Code does not depend on whether the arrest or search was legal nor on a defendant's belief about their legality. *See Salazar v. State*, 643 S.W.2d 953 (Tex. App. 1983). A police officer is still acting within the lawful discharge of his duty even when he makes an unlawful arrest so long as he is acting within his capacity as a peace officer. *See Montoyer v. State*, 744 S.W.2d 15, 29-30 (Tex. Crim. App. 1987).

argument runs afoul of *Keller's* definition of a collateral matter.[11] Appellant could not impeach on a collateral matter and this appears to foreclose his contention. However, neither party has briefed this proposition of law and appellant generally urges that despite any proposition of law, constitutional error occurred.

Appellant relies solely upon the Sixth Amendment to the United States Constitution to support his claim that his right of cross-examination was improperly limited.[12] The Sixth Amendment to the United States Constitution guarantees the right of an accused in a criminal prosecution to be confronted with the witnesses against him. U.S. Const. amend. IV. A primary interest secured by the Confrontation Clause is the right of cross-examination. *Lopez v. State*, 18 S.W.3d 220, 222 (Tex. Crim. App. 2000). The practice of exposing a witness's motivation to testify against a defendant is a "proper and important function of the constitutionally protected right of cross-examination." *Delaware v. Van Arsdale*, 475 U.S. 673, 679 (1986). The right is secured to defendants in state as well as federal criminal proceedings. *Douglas v. Alabama*, 380 U.S. 415, 418 (1965) (citing *Painter v. Texas*, 380 U.S. 400 (1965)).

This constitutional right of confrontation is violated when appropriate cross-examination is limited. *Carroll v. State*, 916 S.W.2d 494, 497 (Tex. Crim. App. 1998); *Hurd v.*

---

[11] We do not find that this contention was ever presented to the trial court. A trial objection stating one legal theory may not be used to support a different legal theory on appeal. *Rezac v. State*, 782 S.W.2d 869, 870 (Tex. Crim. App. 1990).

[12] Appellant does not cite the Texas Constitution nor claim that the state constitution grants him greater rights than the federal constitution. Consequently, we will not address that question and assume for the purpose of this opinion that appellant's rights under the Texas Constitution are comparable to those guaranteed by the United States Constitution. *See Nevels v. State*, 954 S.W.2d 154, 157 n.2 (Tex. App.—Waco 1997, pet. ref'd); *Gonzales v. State*, 929 S.W.2d 546, 548-49 (Tex. App.—Austin 1996, pet. ref'd).

*State*, 725 S.W.2d 249, 252 (Tex. Crim. App. 1987); *Stevenson v. State*, 997 S.W.2d 766, 768 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd).  Appropriate cross-examination includes all avenues reasonably calculated to expose a motive, bias, or interest for the witness to testify.  *Carroll*, 916 S.W.2d at 497; *Lewis v. State*, 845 S.W.2d 560, 565 (Tex. Crim. App. 1991).

> It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness.  On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, *among other things*, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.  And as we observed earlier this Term, "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."

*Van Arsdall*, 475 U.S. at 679 (citation omitted and emphasis added);[13] *see also Carpenter v. State*, 979 S.W.2d 633, 634-35 (Tex. Crim. App. 1998); *Gonzales v. State*, 929 S.W.2d 546, 551 (Tex. App.—Austin 1996, pet. ref'd).

Thus, a trial court may permissibly limit the scope of cross-examination under certain circumstances.  *Carroll*, 916 S.W.2d at 498.  In *Guiterrez v. State*, 764 S.W.2d 796 (Tex. Crim. App. 1989), the court wrote:

> The Sixth Amendment, however, is not a talisman justifying forays into matters that are collateral to the issues at trial.  Although it tips the scales in favor of permitting cross-examination, the Sixth Amendment does not prevent the trial court

---

[13]  It is clear from the language of *Delaware v. Van Arsdale*, 475 U.S. 673, 679 (1986), that the "concerns" or factors listed which may permit trial courts to limit cross-examination are non-exclusive.

from evaluating the subject of inquiry, determining its probative value to the trier of fact and its probable effect on the fair and efficient conduct of the trial.

*Id.* at 799. (Citations omitted.)

Cross-examination may also be limited if it is not calculated to reveal bias or motive to testify falsely. *See Carroll*, 916 S.W.2d at 498; *Stevenson*, 997 S.W.2d at 768; *see also Chipman v. Mercer*, 628 F.2d 528, 531 (9th Cir. 1980) ("[S]ome topics may be of such minimal relevance that the trial court would be justified either in totally prohibiting cross-examination about them or in allowing only limited questioning.").

In the instant case, appellant's reliance upon the Sixth Amendment is misplaced. The Sixth Amendment does not justify appellant's attempts to impeach Hale on the basis of collateral matters not relevant to proving a *material* issue in the case. *See Ramirez*, 802 S.W.2d at 675; *Poole*, 974 S.W.2d at 905. Further, the careful trial court permitted some cross-examination and found the excluded evidence has "little relevancy" to the case. *Cf.* Tex. R. Evid. 401, 402; *Ellis v. State*, 99 S.W.3d 783, 789 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd).

Even if the evidence is relevant, it has been said that each case should be considered on it own merits, and that in weighing whether evidence must be admitted under the confrontation clause, the trial court should balance the probative value of the evidence sought to be introduced against the risk the admission may entail. *Lopez*, 18 S.W.3d at 222; *Nevels v. State*, 954 S.W.2d 154, 157 (Tex. App.—Waco 1997, pet. ref'd); *Gonzales v. State*, 929 S.W.2d 546, 551 (Tex. App.—Austin 1996, pet. ref'd); Tex. R. Evid. 403. This is what the trial court did as to the excluded evidence.

32

If a trial court's decision is correct on any theory of law applicable to a case, it will be sustained on appeal. *Hughes v. State*, 24 S.W.3d 833, 840 n.4 (Tex. Crim. App. 2000); *Jones v. State*, 982 S.W.2d 386, 389 (Tex. Crim. App. 1998). This is particularly true in a review of an issue involving the admissibility of evidence. *McDuff v. State*, 939 S.W.2d 607, 619 (Tex. Crim. App. 1997). And the principle holds true even when a trial court gives the wrong reasons for its decision. *Romero v. State*, 800 S.W.2d 539, 543-44 (Tex. Crim. App. 1990).

A trial court's decision to admit or exclude evidence is afforded a great deal of discretion. *Montgomery v. State*, 810 S.W.2d 372, 378-79 (Tex. Crim. App. 1990). Therefore, we review a trial court's ruling on the admission or exclusion of evidence under an abuse of discretion standard. *Burden v. State*, 55 S.W.3d 608, 615 (Tex. Crim. App. 2001); *Angleton v. State*, 971 S.W.2d 65, 67 (Tex. Crim. App. 1998). If the trial court's evidentiary ruling is reasonably supported by the record under any theory of applicable law, it will be upheld on appeal. This is known as the "zone of reasonable disagreement" test. *Montgomery*, 810 S.W.2d at 391. The trial court did not abuse its discretion in limiting the cross-examination of the witness Hale on the "relationship" question for the reasons discussed.

**Harmless Error Analysis**

We have found no merit in appellant's point of error although appellant insists that there was constitutional error and that it was not harmless under the standard of Rule 44.2 of the Texas Rules of Appellate Procedure. In light of the nature of the case, the punishment assessed, and the delay which accompanies any possible remand for a harm analysis, we shall conduct an analysis now.

33

Rule 44.2(a) provides:

> (a) Constitutional Error. If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment.

We do not focus on the propriety of the outcome of the trial but the integrity of the process that led to the conviction and punishment. *Harris v. State*, 790 S.W.2d 568, 587-88 (Tex. Crim. App. 1989). There was overwhelming evidence of appellant's guilt of capital murder as charged, but the question is whether the overwhelming evidence of guilt dissipates the error's effect upon the jury's function in determining the facts so that the error did not contribute to the verdict. *See Davis v. State*, 8 S.W.3d 777, 784 (Tex. App.—San Antonio 2000, no pet.). From the record as a whole, we conclude beyond a reasonable doubt that the error, if any, of excluding the balance of Hale's testimony about the "relationship" did not contribute to appellant's conviction. The State waived the death penalty so the trial court automatically imposed a life sentence, the only punishment then available for capital murder as found by the jury. *See* Tex. Pen. Code Ann. § 12.31 (West 2003). The error, if any, did not contribute to the punishment. Appellant's third point of error is overruled.

## More Limited Cross-Examination

In his fourth point of error, appellant contends that the trial court erred in limiting the cross-examination of Deputy Billy Poole "regarding his relationship with the confidential

informant." The contention is strikingly similar to that urged in the third point of error except that the trial court refused to allow any interrogation before the jury on the subject matter.

Investigator Billy Poole was a Travis County deputy sheriff and the case agent for the narcotics investigation of appellant. He also participated in the execution of the search warrant during which time Deputy Ruiz was fatally wounded. On both direct and cross-examination, Poole testified as to the events that occurred on the night in question.

During cross-examination, he was asked:

Q. And everything connected with that raid was done professionally and there was no personal consideration taken into account, correct?

A. Correct.

At this point, appellant asked to proffer testimony in the jury's absence. The hearing was held in chambers at the conclusion of the cross-examination. Poole testified that he knew the confidential informant's brothers, Mike and Manny, and had worked with Mike, who had once been his partner. Poole testified that about a year or so before the offense he met E.M., the informant, at a funeral for the grandmother of the brothers, which he (Poole) attended to support Mike. This was the only time that Poole had seen E.M. Poole related that all the information furnished him about appellant's activities came from Deputy Hale, not through any contact with E.M. Poole testified that his relationship with Mike and his family did not affect in any way the manner in which he dealt with the investigation. At the conclusion of the hearing, the trial court took the matter under advisement.

Here, as with the witness Hale, appellant called Poole as a witness during the presentation of the defense case. Therefore, the trial court immediately ruled that it would not permit

35

the "relationship" cross-examination because the evidence showed that Poole had no interest or bias that would affect him personally. The trial court, in effect, held that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. Appellant objected and the trial court announced that appellant "had" his bill of exception.

Here again, appellant was bound by the answer he received from Poole during cross-examination before the jury as to professionalism. A party may not cross-examine a witness on a collateral matter, then contradict the witness's answer. *Shipman*, 604 S.W.2d at 184-85. Moreover, the topic was of such minimal relevance that the trial court was justified in totally prohibiting cross-examination on the topic. *Chipman*, 628 F.2d at 531. Our discussion under the third point of error clearly shows that appellant's claimed constitutional error is without merit, and that if there was constitutional error, it was harmless error under the standard of Rule 44.2. Tex. R. App. P. 44.2. The fourth point of error is overruled.

The judgment is affirmed.

_____

John F. Onion, Jr., Justice

Before Chief Justice Law, Justices Puryear and Onion[*]

Affirmed

Filed: February 5, 2004

Publish

[*] Before John F. Onion, Jr., Presiding Judge (retired), Court of Criminal Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).